UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

JAMES BALDWIN,                                           **DECISION AND ORDER**

                         Petitioner,

            v.                                                        6:20-CV-06989 EAW

JULIE WOLCOTT,[1]

                         Respondent.

_____

## I.    **INTRODUCTION**

*Pro se* petitioner James Baldwin ("Petitioner"), a prisoner in Respondent's custody,[2]

seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  (Dkt. 1).  Petitioner challenges

the constitutionality of the judgment entered against him on August 13, 2010, in New York

State Supreme Court, Erie County (Boller, J.).  (*Id.* at 1).[3]  Petitioner was convicted after a

jury trial of one count of second-degree arson (New York Penal Law ("P.L.") § 150.15).

(*Id.*).  He is presently serving a 25-year determinate sentence of imprisonment, to be

_____

[1]      Julie Wolcott is the current Superintendent of Attica Correctional Facility, where
Petitioner is incarcerated.  *See* https://doccs.ny.gov/location/attica-correctional-facility
(last accessed Mar. 11, 2024); *see also infra* n.2.  The Clerk of Court accordingly is directed
to update the caption to replace Joseph Noeth with Julie Wolcott.

[2]      *See* New York State Department of Corrections and Community Supervision
Incarcerated Lookup, *available at* https://nysdoccslookup.doccs.ny.gov/ (search results for
DIN 10B2568) (last accessed Feb. 29, 2024).

[3]      Page citations to pleadings filed by Petitioner are to the pagination automatically
generated by the Court's case management and electronic filing system (CM/ECF) and
located in the header of each page.  Page citations to Respondent's pleadings are to the
original pagination.

followed by five years' post-release supervision. For the reasons below, the request for a writ of habeas corpus is denied, and the petition is dismissed.

## II.    BACKGROUND

### A.    Indictment and Trial

An Erie County grand jury returned an indictment charging Petitioner with one count of second-degree arson (P.L. § 150.15) and one count of second-degree burglary (P.L. § 140.25(2)). *See* Erie County Indictment No. 01297-2009, Respondent's Exhibit ("Resp't Ex.") A.[4]  The indictment alleged that on May 16, 2008, Petitioner intentionally damaged the building at 55 Barthel Street in the City of Buffalo by starting a fire when another person who was not a participant in the crime was in the building. *Id.* at 1. The indictment further alleged that on May 16, 2008, Petitioner intentionally and unlawfully entered the dwelling of Jacqueline Holloman ("Holloman") with intent to commit a crime therein. *Id.* at 1-2.

Petitioner's case proceeded to a jury trial in New York State Supreme Court, Erie County, before Acting Supreme Court Justice M. William Boller ("trial court"). A summary of the relevant testimony follows.[5]

---

[4]    Respondent's Exhibit A consists of the Erie County District Attorney's case file and the transcripts from Petitioner's criminal proceeding. These documents were manually filed by Respondent in connection with his answer to the petition. Respondent also manually filed the briefs and orders in connection with Petitioner's direct appeal in a separately bound appendix. (Resp't Exs. B and C).

[5]    "In view of [Petitioner]'s conviction, [the Court] summarize[s] the facts in the light most favorable to the verdict." *Garbutt v. Conway*, 668 F.3d 79, 80 (2d Cir. 2012) (per curiam) (citing *United States v. Riggi*, 541 F.3d 94, 96 (2d Cir. 2008)).

In May 2008, Holloman was living in the lower apartment of a duplex at 55 Barthel Street with her two sons, Terrence James ("Terrence") and Anthony; her brother, Randy; and Randy's girlfriend, Jeanie. (Holloman: 340-41; Terrence: 253).[6]  Randy and Jeanie shared the bedroom in the front of the house, Holloman's sons shared the middle bedroom, and Holloman had the bedroom in the rear of the house. (Holloman: 342-44; Terrence: 257).  The front window of the house did not lock properly, and sometimes Randy and Jeanie would use it to get into the house if Holloman was not home. (Holloman: 402-03).

Petitioner lived in the upstairs apartment at 55 Barthel Street with Michael Blackmon ("Blackmon") for about five years until early May 2008. (Blackmon: 278-79; Holloman: 344-45).  Blackmon had to ask Petitioner to leave because he was not paying rent and as of May 16, 2008, Petitioner no longer lived there. (Blackmon: 279).

After moving out of Barthel Street, Petitioner moved into the downstairs apartment at 756 East Amherst Street.  His friends Tina Johnson ("Johnson") and Kenneth Belle ("Belle") lived upstairs. (Johnson: 288-89).

Petitioner and Holloman dated for two or three months prior to May 16, 2008. (Holloman: 346).  While they were dating, Holloman told Petitioner about the window which did not lock and how Randy sometimes used it to get in and out of the house.

---

[6]     Citations to "[name]: [page number]" refer to pages of a particular witness's trial testimony.  Citations to "T." refer to pages of the trial transcript that do not reflect witness testimony.  Citations to "S." refer to pages of the sentencing transcript.  Page citations to the transcripts are to the original pagination.

(Holloman: 403). This aggravated her and she mentioned to Petitioner that she did not want him also using that window to go in and out of the house. (Holloman: 404).

Shortly before May 16, 2008, Holloman broke up with Petitioner because he was "smothering" her and she just "couldn't breathe." (Holloman: 345-46, 347). She ended the relationship by "[b]asically ignor[ing] him." (Holloman: 346). Petitioner kept calling her and driving by her house, wanting to "know what was wrong with [her]." (Holloman: 348).

On May 15, 2008, Terrence saw Petitioner at the corner of Barthel and Genesee Streets, sitting in his parked taxicab, and watching their house through binoculars. (Terrence: 272).

On the evening of May 16, 2008, Holloman and her two sons went to a fundraiser at the Golden Nugget on Fillmore Avenue. (Holloman: 349; Terrence: 254-56). Petitioner wanted to go, but Holloman did not want him to attend and did not buy him a ticket. (Holloman: 350-51).

Holloman and her sons returned from the fundraiser between 11 p.m. and midnight. (Holloman: 353; Terrence: 255). Randy and Jeanie also were home. (Holloman: 354; Terrence: 256-57). Holloman and her sons went to her bedroom in the rear of the apartment to watch television. (Holloman: 355; Terrence: 259-60). They observed nothing unusual about the boys' bedroom. (Holloman: 355-56; Terrence: 259).

Not long after Holloman and her sons returned home, Petitioner appeared at her bedroom window and began banging on it; he also tried to open it. (Holloman: 356-58; Terrence: 260-61). While banging on the window and demanding to be let in, Petitioner

repeatedly called Holloman's cell phone.  (Holloman: 358-59).  Holloman had Terrence answer the phone and tell Petitioner that he could not let Petitioner in because Holloman was not home.  (Holloman: 359; Terrence: 263).  Petitioner told Terrence that he was "wrong" for not allowing him inside.  (Holloman: 359; Terrence: 263, 273).  Petitioner continued to bang on the window and call Holloman's phone.  (Holloman: 357, 359; Terrence: 263).  This went on for about 40 minutes to an hour.  (Holloman: 359-60; Terrence: 263).

Holloman and Terrence heard Blackmon come down the stairs at the back of the house and go out onto the porch.  (Holloman: 360-61; Terrence: 264).  Petitioner asked Blackmon if he wanted to drink some beer, and Blackmon said yes.  (Holloman: 360-61).  For a while, there were no phone calls or banging on the windows.  (Holloman: 361-62; Terrence: 264).

Petitioner gave Blackmon some money to go buy beer and cigarettes; when Blackmon returned they spent about an hour smoking cigarettes and drinking beer in his apartment.  (Blackmon: 281-82).  Blackmon knew Petitioner to be a smoker.  (T: 282).  Petitioner told Blackmon he "didn't need" Holloman, could "do without her," and could "get any woman he want[ed]."  (Blackmon: 283).  Petitioner said he was "mad" that Holloman refused to let him in.  (Blackmon: 283-84).

After Petitioner left Blackmon's apartment, he started banging on Holloman's window again.  (Holloman: 361-62; Terrence: 264-65; Blackmon: 282-83, 284).  This went on for another 15 or 20 minutes.  (Holloman: 362; Terrence: 265; Holloman: 284).

Holloman, Terrence, and Anthony eventually fell asleep.   (Holloman: 362-63; Terrence: 265-66).  They woke up to Randy and Jeanie shouting that there was a fire and that they had to get out of the house.  (Holloman: 363; Terrence: 266).  Randy broke the bedroom window, and Terrence jumped out.  (Holloman: 364; Terrence: 266).  Holloman handed Anthony to Randy through the window.  (Holloman: 364; Terrence: 268).  Once outside, Holloman could see that the fire was coming from the boys' bedroom in the middle of the house.  (Holloman: 365).  The window to that bedroom eventually exploded. (Holloman: 366).

After the fire department had arrived but while the fire still was burning, Terrence saw Petitioner at the corner of Barthel Street, about two houses down from their house. (Terrence: 269-70).  Petitioner was walking toward their house, but when he saw Terrence, he turned around and walked the other way.  (Terrence: 270).

Jermaine Long ("Long"), Petitioner's former coworker at Cold Spring Taxi, picked Petitioner up from Earl's Lounge sometime between 11 p.m. on May 16, 2008, and 3 a.m. on May 17, 2008.  (Long: 312).  At Petitioner's request, they drove in Long's cab over to Barthel Street to see the fire.  (*Id.*).  They circled the block but could not get down the street due to the emergency responders' presence.  (Long: 312-13).  After that, they went to a bar and then to a store.  (Long: 313).  During the time they were together, Petitioner asked Long to drive by Barthel Street about five or six times; Long took him there about three times total.  (Long: 314).  He eventually dropped Petitioner off at his apartment on East Amherst Street.  (Long: 315).

When Petitioner got home, he went to Johnson and Belle's apartment and woke them up.  (Johnson: 290-91).  Petitioner "grabbed" Johnson and Belle, "kissed [them] on the cheek," and said that he "loved" them and that they were his friends.  (Johnson: 292; Belle: 321).  He also said that "no bitch ignores him."  (Johnson: 292; Belle: 321).  The three of them spent some time in Petitioner's apartment, talking and drinking wine. (Johnson: 291-92; Belle: 321).

When a story about the fire came on the morning news, Petitioner said, "turn this shit off, I don't want to see that."  (Belle: 323-24).  He told Belle, "I did it," referring to the fire.  (Belle: 324).  Petitioner separately told Johnson, "I got that bitch, I burned that bitch down."  (Johnson: 292).  Johnson knew he was talking about Holloman's house because the fire had just been reported on the news.  (Johnson: 292-93).  Johnson replied, "I told you not to do that."  (Johnson: 293).

About two weeks after the fire, Holloman accused Petitioner of setting it. (Holloman: 368).  Petitioner said, "I swear I didn't set your house on fire," gave her $100, and told her to call him if she needed anything.  (Holloman: 368).

Sometime between May 16 and November 2008, Holloman resumed her relationship with Petitioner and moved in with him.  (Holloman: 369).  Terrence and Anthony stayed with Holloman's sister.  (Holloman: 369-71).

During an argument in the middle of November 2008, Holloman told Petitioner that she knew he set the fire.  (Holloman: 368).  Petitioner replied that "he wanted to hold [her], and he thought someone was in there."  (Holloman: 368-69, 373-74).

The fire marshal for the City of Buffalo Fire Department, George Arthur, Jr. ("Arthur"), investigated the scene.  Based on the amount of charring in the wood and the fire damage to the ceiling, he concluded that the fire originated in the middle bedroom. (Arthur: 413, 417-19).  Accidental causes such as a dropped cigarette or careless cooking were ruled out, leaving the "human element" as the only possible cause for the fire. (Arthur: 420-22).

After the prosecution rested, the defense made a motion for a trial order of dismissal, which was denied.  (T: 449-54).  Thereafter, the defense rested without calling any witnesses.  (T: 455).

The trial court charged the jury on the two counts in the indictment.  (T: 517-20). The jury returned a verdict acquitting Petitioner of the burglary charge and convicting him of the arson charge.  (T: 526).

Prior to sentencing, Petitioner filed a counseled motion to set aside the verdict under New York Criminal Procedure Law ("C.P.L.") § 330.30(1) ("330 motion").[7]  On August 13, 2010, the parties appeared for sentencing, and the trial court heard oral argument on the 330 motion.  (S: 2-5).  Petitioner contended that the guilty verdict on the second-degree arson count was inconsistent with the acquittal on the second-degree burglary count alleging that he unlawfully entered a dwelling with the intent to commit a crime therein. (S: 2-4).  Petitioner noted the fire marshal's testimony that the fire started inside the house, not outside the house, and that it was not caused by something tossed through the window

---

[7]     The 330 motion is not in the state court records filed by Respondent.

since the window blew out during the fire.  (S: 2-3).  Petitioner argued that to find him guilty of arson, the jury had to conclude he entered the house.  (S: 3).  However, the jury acquitted him of burglary, which meant it did not find he entered the house.  (S: 3-4).  The prosecutor opposed the motion as untimely and unpreserved.  (S: 4).

The trial court found the verdict was not inconsistent but "merely that the jury did not find beyond a reasonable doubt all the elements of" second-degree burglary.  (S: 5). The trial court proceeded to sentence Petitioner to a determinate term of 25 years' imprisonment to be followed by five years' post-release supervision.  (S: 7).

## B.    Direct Appeal

Represented by new counsel, Petitioner pursued a direct appeal of his conviction. *See* Resp't Ex. B.  On June 14, 2019, the judgment was unanimously affirmed by the Appellate Division, Fourth Department, of New York State Supreme Court ("Appellate Division").  *People v. Baldwin*, 173 A.D.3d 1748 (4th Dep't 2019).  Petitioner sought leave to appeal as to all issues raised in his appellate brief.  *See* Resp't Ex. C.  The New York Court of Appeals denied leave to appeal on August 23, 2019.  *People v. Baldwin*, 34 N.Y.3d 928 (2019).

## C.    Federal Habeas Proceeding

Petitioner timely filed the petition on November 14, 2020.  (Dkt. 1 at 11).  He reasserts the same claims raised on direct appeal: the evidence of identity was legally insufficient to satisfy due process, and the weight of the evidence favored the defense (*id.* at 7, 9 ("ground one")); the prosecutor committed prejudicial misconduct during summation (*id.* at 8, 9) ("ground two"); the verdict acquitting him of second-degree

burglary was repugnant to the verdict convicting him of second-degree arson, and defense counsel was ineffective for failing to object to this error (*id.*) ("ground three"); and the sentence was an abuse of discretion and violative of the Eighth Amendment (*id.*) ("ground four").

Respondent filed an answer (Dkt. 8) and memorandum of law (Dkt. 9) arguing that Petitioner's grounds for relief are meritless. Respondent manually filed the state court records and trial transcripts. *See* Resp't Exs. A, B, and C. Petitioner filed a reply. (Dkt. 10).

## III.   <u>STANDARD OF REVIEW</u>

Under 28 U.S.C. § 2254(d), a federal court "shall not . . . grant[ ]" an application for a writ of habeas corpus "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d). In addition, a state court's factual findings are entitled to a presumption of correctness which only may be rebutted by "clear and convincing evidence." *Id.* § 2254(e)(1).

"By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011). Section 2254(d) articulates a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the

benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (citation and internal quotation marks omitted).

## IV.    **DISCUSSION**

### A.    **Legal Insufficiency of the Evidence and Verdict Against the Weight of the Evidence (Ground One)**

Petitioner claims that the evidence of identity was legally insufficient to support the conviction and that the verdict was against the weight of the credible evidence.  (Dkt. 1 at 7, 9).

The Appellate Division rejected the legal insufficiency claim on the merits. *Baldwin*, 173 A.D.3d at 1748-49.  Viewing the evidence in the light most favorable to the prosecution, as required by law, the Appellate Division found there was a "valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury."  *Id.* at 1748-49 (quoting *People v. Bleakley*, 69 N.Y.2d 490, 495 (1987)).

The Appellate Division also held that viewing the evidence in light of the elements of the crime as charged to the jury, the verdict was not against the weight of the evidence with respect to Petitioner's identity as the perpetrator.  *Id.* at 1749.  The Appellate Division stated that even assuming "a different verdict would not have been unreasonable," *id.*, it could not say "the jury failed to give the evidence the weight it should be accorded."  *Id.* (quoting *People v. Jackson*, 162 A.D.3d 1567, 1567 (4th Dep't 2018)).

### 1.   Legal Insufficiency of the Evidence

The Due Process Clause of the Fourteenth Amendment prohibits a criminal conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime." *In re Winship*, 397 U.S. 358, 364 (1970).  As the Supreme Court has interpreted *Winship*, evidence is legally sufficient to satisfy due process if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).  Where the trial record "supports conflicting inferences," the Court "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *McDaniel v. Brown*, 558 U.S. 120, 133 (2010) (per curiam) (quoting *Jackson*, 443 U.S. at 319).

Where, as here, the state court has adjudicated a legal insufficiency claim on the merits, the habeas court must apply a layer of deference in addition to that imposed by *Jackson* itself.  *Coleman v. Johnson*, 566 U.S. 650, 651 (2012).  The habeas court "may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court." *Id.* (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam)).  Instead, the federal habeas court "may do so only if the state court decision was 'objectively unreasonable.'" *Cavazos*, 565 U.S. at 2 (quoting *Renico v. Lett*, 599 U.S. 766, 773 (2010)).  In finding that a rational jury could have found the prosecution proved all the elements of second-degree arson beyond a reasonable doubt, the Appellate Division did not rule in a manner contrary to, or unreasonably apply, *Jackson*.

A legal sufficiency analysis begins with identifying the substantive elements of the underlying crime. *See Jackson*, 443 U.S. at 324 n.16. To secure a conviction under P.L. § 150.15, the prosecution must prove that the defendant intentionally damaged a building by starting a fire; and that either the defendant knew a non-participant in the crime actually was present in the building or the circumstances were such as to render that person's presence in the building a reasonable possibility. *See* N.Y. Penal Law § 150.15. Of course, the prosecution also must prove that the defendant was the person who committed the charged offense. *See* N.Y. Crim. Proc. Law § 70.20 ("No conviction of an offense by verdict is valid unless based upon trial evidence which is legally sufficient and which establishes beyond a reasonable doubt every element of such offense and the [d]efendant's commission thereof.").

Petitioner claims that the evidence of identity is insufficient because none of the prosecution's witnesses provided direct testimony placing him inside the building. While "[i]dentity is always an essential element of a criminal prosecution, . . . 'there is no rule of law that requires identity to be established by an eyewitness.'" *Gibson v. LaValley*, No. 12-CV-6031 MAT, 2012 WL 5288776, at *8 (W.D.N.Y. Oct. 23, 2012) (quoting *United States v. Kwong*, 14 F.3d 189, 193 (2d Cir. 1994)). Instead, "[i]dentity can be inferred through circumstantial evidence." *Id.* (quoting *Kwong*, 14 F.3d at 193).

With regard to the direct evidence adduced by the prosecution, Petitioner argues that his alleged statements to Belle and Johnson did not amount to conclusive admissions of guilt. *See* Petitioner's Appellate Brief at 10-11, Resp't Ex. B. He also contends they were not credible witnesses because they were drunk at the time of the alleged admissions and

they testified under material witness orders.  *See id.*  Petitioner questions the reliability of Holloman's testimony about his purported admission of guilt, noting that she moved in with him after the fire.  *See id.* at 12.  According to Petitioner, this showed she did not believe he was responsible for starting it.  *Id.*  During summation, defense counsel presented extensive argument regarding the credibility of Holloman, Belle, and Johnson and the appropriate weight to be given to, and the inferences to be drawn from, their testimony.  (T: 470-80, 483-84).  The jury, by their guilty verdict on the second-degree arson count, rejected those arguments.

Under *Jackson*, it is the "responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."  443 U.S. at 319.  Such inquiries are beyond the purview of a habeas court.  *See Wilson v. Capra*, No. 20-4140-PR, 2023 WL 7179268, at *2 (2d Cir. Nov. 1, 2023) ("[N]one of [the] purported credibility issues identified by Wilson rendered the testimony of either eyewitness unworthy of reliance by a rational jury.  The defense presented these issues to the jury, and there is no basis to disturb the jury's credibility assessment.") (citing *Gruttola v. Hammock*, 639 F.2d 922, 928 (2d Cir. 1981) ("[T]he jury's decision was largely a matter of choosing whether to believe [the petitioner's] version of the events or to believe the version offered by the State.  The jury chose to believe the State's witnesses, despite the inconsistencies in the evidence and the character testimony.  We cannot say that no rational jury could have found guilt beyond a reasonable doubt on all the evidence.")).

As the Appellate Division noted on direct appeal, the prosecution adduced "undisputed" circumstantial evidence establishing that Petitioner had both a motive and the opportunity to commit the crime. 173 A.D.3d at 1748. Petitioner was "upset" with Holloman because she "was ignoring him." *Id.* On the night of the fire, Petitioner "banged on the doors and window of [Holloman]'s apartment, asking to be let in" and "repeatedly called [Holloman]'s cell phone, only to be told by her son that he could not let [Petitioner] inside." *Id.* Petitioner then told his former roommate, Blackmon, that he was "angry" at Holloman because she would not allow him to come in. *Id.* Shortly after these events, a fire was started at Holloman's apartment. *Id.* The fire marshal testified that "the fire was deliberately set." *Id.* Holloman's son, Terrence, testified that during the fire, he saw Petitioner walking towards their house. *Id.* Petitioner "turned around and walked away after noticing him." *Id.* The Appellate Division further noted that the prosecution presented direct proof of identity through the testimony of Holloman, Belle, and Johnson, to whom Petitioner admitted having started the fire. *Id.*

On the basis of the facts adduced at trial, a rational jury could infer that it was Petitioner who intentionally damaged the building located at 55 Barthel Street by starting a fire in the first-story middle bedroom; and that when he started the fire, he had actual knowledge that at least three non-participants in the crime—Holloman and her two sons— were present in the building. "[T]he only question under *Jackson* is whether that finding was so insupportable as to fall below the threshold of bare rationality." *Coleman v. Johnson*, 566 U.S. 650, 656 (2012). The Appellate Division answered this question in the negative, "and that determination in turn is entitled to considerable deference under

AEDPA, 28 U.S.C. § 2254(d)." *Id.* Because Petitioner has not shown that the Appellate Division's rejection of his legal insufficiency claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," *Harrington*, 562 U.S. at 103, he is not entitled to habeas relief.

### 2. Verdict Against the Weight of the Evidence

"A challenge to a verdict based on the weight of the evidence differs from one based on the sufficiency of the evidence." *Echevarria-Perez v. Burge*, 779 F. Supp. 2d 326, 332 (W.D.N.Y. 2011). A "weight of the evidence" claim is grounded in a statutory provision, C.P.L. § 470.15(5), granting intermediate appellate courts in New York State broad factual review power. *See Bleakley*, 69 N.Y.2d at 495. A legal insufficiency claim, on the other hand, is based on due process principles. *See Jackson*, 443 U.S. at 316.

The Second Circuit has recognized that "the argument that a verdict is against the weight of the evidence states a claim under state law." *McKinnon v. Sup't, Great Meadow Corr. Facility*, 422 F. App'x 69, 75 (2d Cir. 2011). As it is well settled that "federal habeas corpus relief does not lie for errors of state law," *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990), courts in this Circuit consistently have dismissed, as not cognizable, claims by habeas petitioners asserting their verdicts were against the weight of the evidence. *See McKinnon*, 422 F. App'x at 75 (collecting cases). Because Petitioner's challenge to the weight of the evidence presents nothing more than an issue of state statutory law, it is dismissed as not cognizable on federal habeas review.

### B.        Prosecutorial Misconduct (Ground Two)

Petitioner claims that the prosecutor committed misconduct during her summation and substantially prejudiced his right to a fair trial.  (Dkt. 1 at 8, 9).  The Appellate Division summarily denied this claim without discussion.  *See Baldwin*, 173 A.D.3d at 1749 (concluding that the "remaining contentions . . . lack[ed] merit").

The relevant standard on habeas review for evaluating prosecutorial misconduct claims is "the narrow one of due process, and not the broad exercise of supervisory power." *Darden v. Wainwright*, 477 U.S. 168, 180 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)).  Improper conduct by the prosecutor warrants habeas relief "only if [it] '"so infected the trial with unfairness as to make the resulting conviction a denial of due process."'"  *Jackson v. Conway*, 763 F.3d 115, 146 (2d Cir. 2014) (quoting *Darden*, 477 U.S. at 180 (quoting *Donnelly*, 416 U.S. at 643)).

When making this determination, the habeas court "must consider the record as a whole . . . because even a prosecutor's inappropriate or erroneous comments or conduct may not be sufficient to undermine the fairness of the proceedings when viewed in context."  *Id.* (citing *United States v. Young*, 470 U.S. 1, 16-17 (1985)).  "[T]he reviewing court must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo."  *Young*, 470 U.S. at 12.

Petitioner first challenges the following comment:  "So when [defense counsel] says this is a wholly circumstantial case, that is by no means the truth."  (T: 487).  Petitioner contends that this comment somehow denigrated the defense.  To the contrary, it accurately reflected defense counsel's summation comments.  (*See* T: 470, 482).  Moreover, defense

counsel's characterization of the prosecution's proof as wholly circumstantial was inaccurate. As the Appellate Division found, the prosecution presented direct evidence of guilt via testimony from Holloman, Belle, and Johnson that Petitioner admitted to them he started the fire. Here, the prosecutor's comment was "invited" by defense counsel's summation and "did no more than respond substantially in order to 'right the scale.'" *Young*, 470 U.S. at 12. Therefore, it was not improper.

Petitioner next challenges the following comment as a misstatement of the evidence:

So it is then a reasonable and logical inference from that that he was the person inside the house just a few minutes later, as heard by the footsteps that were inside the house. By then, the footsteps that were coming from the fire that was burning in the little boys' bedroom.

(T: 488-89). Defense counsel objected to the remark about the footsteps, stating, "I don't believe there was any testimony that somebody heard footsteps. Maybe I'm mistaken, but I think that was the people that didn't testify." (T: 489).[8] The trial court responded, "Well, this is this attorney's view of what was said. . . . I will tell the jury that they'll be able to ask for a read back of any portion." (*Id.*).

Lastly, Petitioner asserts that the prosecutor again mischaracterized the evidence by stating, "We know he had access to a lighter, to a way in which to start the fire." (T: 492). Defense counsel objected to the remark about the lighter, stating that it mischaracterized the evidence as there had "been no testimony about a lighter." (*Id.*). The trial court noted

---

[8]    The Court assumes defense counsel was referring to Randy and Jeanie, who Holloman and Terrence testified were home on the night of the fire.

that "[t]his, again, is something for the jury to decide, and the testimony can be read back." (*Id.*).

The prosecution conceded on direct appeal that there was no testimony supporting the argument that anyone heard footsteps inside the home prior to the fire being set.  *See* People's Appellate Brief at 10, Resp't Ex. B.  However, the prosecutor did not concede that the comment about the lighter was inaccurate.  Instead, the prosecutor contended that in light of Blackmon's testimony that he knew Petitioner to be a smoker, and that they had smoked cigarettes together that night, it was "not too great of an inferential leap for the prosecutor to argue that" Petitioner "had access to a lighter."  *Id.* at 11.  Fairly read, the prosecutor's comment did more than ask the jury to draw an inference from Blackmon's testimony.  By beginning her remark with, "[w]e know," the prosecutor strongly implied there was undisputed proof that Petitioner had access to a lighter.  However, there was no testimony as to how Petitioner and Blackmon lit their cigarettes.

A defendant has the "right to be tried solely on the basis of the evidence presented to the jury," *Young*, 470 U.S. at 18, and thus it "is improper for a prosecutor to mischaracterize the evidence or refer in summation to facts not in evidence." *United States v. Rosa*, 17 F.3d 1531, 1548-49 (2d Cir. 1994).  However, even under pre-AEDPA standards, inappropriate prosecutorial comments without a showing of prejudice would not justify reversal of a criminal conviction. *See Young*, 470 U.S. at 11-12.  Because there has been an adjudication on the merits, the "sole issue" is "whether it was objectively unreasonable" for the Appellate Division "to find that the behavior did not 'so infect[ ] the trial with unfairness' that it deprived [Petitioner] of due process." *Jackson*, 763 F.3d at

148 (quotation marks omitted in original) (quoting *Darden*, 477 U.S. at 180).  On the record before it, the Court cannot reach such a conclusion.

When assessing the effect of an improper comment by the prosecutor on the fairness of a trial, it is appropriate to look at the trial court's jury instructions and any curative measures it took.  *See Donnelly*, 416 U.S. at 644.  Here, after each objection, the trial court told the jury that the prosecutor was simply stating her view of the evidence and that the relevant testimony was available for a read-back at their request.  Defense counsel did not object any further, indicating that he viewed the instructions as sufficient.  (T: 490, 492).  When the prosecutor resumed her argument, she did not repeat the objectionable comments.  In addition, the prosecutor reminded the jury that "[n]othing" that she or defense counsel said was evidence.  (T: 485).

Furthermore, the trial court instructed the jury on several occasions that nothing the attorneys said—whether in their opening statements or closing arguments or any other time—was evidence in the case and that the jury was the ultimate arbiter of the facts.  (T: 239, 468-69, 503-04).   As the jury is presumed to have followed the trial court's instructions, *Richardson v. Marsh*, 481 U.S. 200, 211 (1987), any risk of prejudice was mitigated.  *See Greer v. Miller*, 483 U.S. 756, 766 (1987) ("The sequence of events in this case—a single question, an immediate objection, and two curative instructions—clearly indicates that the prosecutor's improper question did not violate [the petitioner's] due process rights.").

The Supreme Court has described its standard for evaluating prosecutorial misconduct claims as "a very general one," which "leav[es] courts 'more leeway . . . in

reaching outcomes in case-by-case determinations.'" *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (ellipsis in original) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Given the generalized nature of the applicable standard, and the fact that Petitioner's prosecutorial misconduct claim involved two minor aberrations in an otherwise fair proceeding, the Court cannot find that the Appellate Division's rejection of this claim was contrary to, or an unreasonable application of, clearly established Supreme Court precedent. Accordingly, Petitioner is not entitled to habeas relief.

### C. Repugnancy of the Verdicts (Ground Three)

Petitioner claims that the verdicts were repugnant, and that defense counsel was ineffective in failing to object in a timely manner. The Appellate Division found that the repugnancy claim was unpreserved due to defense counsel's failure to object before the jury was discharged. *Baldwin*, 173 A.D.3d at 1749. The Appellate Division alternatively held that "because it was not legally impossible for the jury to convict [Petitioner] of arson in the second degree and acquit him of burglary in the first [sic] degree, as charged by the court, the verdict with respect to those counts is not repugnant." *Id.* The Appellate Division explained that although the prosecution's theory "at trial was that [he] entered the victim's apartment to set the fire, the [trial] court's charge with respect to the arson count did not require the jury to make any such finding." *Id.* The Appellate Division summarily dismissed the ineffectiveness claim as among Petitioner's remaining contentions that lacked merit. *Id.*

### 1.    Repugnant Verdicts

As the Supreme Court has noted, "inconsistency in a verdict is not a sufficient reason for setting it aside." *Harris v. Rivera*, 454 U.S. 339, 345 (1981) (per curiam). Claims based on repugnant or inconsistent verdicts do not set forth a constitutional question and, accordingly, are not cognizable on federal habeas review. *See id.* at 344 (reversing grant of habeas corpus; stating that even assuming the lower court "correctly determined that the verdicts are facially inconsistent, . . . there is no federal requirement that a state trial judge explain his reasons for acquitting a defendant in a state criminal trial" because "even if the acquittal rests on an improper ground, that error would not create a constitutional defect in a guilty verdict that is supported by sufficient evidence and is the product of a fair trial"); *Smith v. Herbert*, 275 F. Supp. 2d 361, 371 (E.D.N.Y. 2003) ("A purported inconsistency in a state court verdict is generally not a basis on which to grant habeas corpus relief.") (citing *Harris*, 454 U.S. at 344-45; *United States v. Powell*, 469 U.S. 57, 69 (1984) (holding that while inconsistency in verdicts was "undisputed," there was "no reason to vacate [the defendant]'s conviction merely because the verdicts cannot be rationally reconciled")).  Petitioner's claim based on the alleged repugnancy between the arson conviction and the burglary acquittal does not state a federal constitutional claim and is dismissed as not cognizable.

### 2.    Ineffective Assistance of Counsel

Petitioner contends that defense counsel was ineffective because he failed to preserve, by timely objection, the argument that the verdicts were repugnant.  (Dkt. 1 at 8,

9).  The Appellate Division rejected this claim as among Petitioner's remaining contentions that were without merit.  *Baldwin*, 173 A.D.3d at 1749.

To fulfill the two-part test in *Strickland v. Washington*, 466 U.S. 668 (1984), a defendant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id.* at 687.  "Second, the defendant must show that the deficient performance prejudiced the defense."  *Id.*  This "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Id.*  "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding."  *Id.* at 693.

The trial court considered and rejected the repugnant verdicts claim on the merits when it was raised in the 330 motion.  The Appellate Division then addressed the merits of the repugnant verdict claim notwithstanding the lack of preservation.  Accordingly, Petitioner cannot show that defense counsel's failure to preserve the repugnant verdicts claim had *any* effect on the outcome of his trial or appeal.  *See*, *e.g.*, *Bierenbaum v. Graham*, 607 F.3d 36, 57 (2d Cir. 2010) (holding that, where the Appellate Division reviewed the legal insufficiency claim despite it being unpreserved, the petitioner could not claim that his counsel was ineffective in failing to preserve the issue for appeal); *Walker v. Bennett*, 262 F. Supp. 2d 25, 40 (W.D.N.Y. 2003) (holding that the petitioner was "unable to establish prejudice based on counsel's failure to object to the prosecutor's remarks" because "[d]espite counsel's failure to object at trial, the Appellate Division reviewed the prosecutorial misconduct claim and found that the prosecutor's summation constituted fair response to the defense summation").

Petitioner's failure to meet both prongs of the *Strickland* standard is fatal to his ineffectiveness claim.  *See Strickland*, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.").  Because the Appellate Division's rejection of the ineffectiveness claim was neither contrary to nor an unreasonable application of *Strickland*, habeas relief is unwarranted.

### D.   Abuse of Sentencing Discretion and Eighth Amendment Violation (Ground Four)

Petitioner complains that the trial court abused its discretion by imposing an unduly harsh and severe sentence.  (Dkt. 1 at 8, 9).  Petitioner also asserts his sentence violated the Eighth Amendment's proscription against cruel and unusual punishment.  (*Id.*).  The Appellate Division summarily rejected these claims without comment.  *Baldwin*, 173 A.D.3d at 1749.

### 1.   Abuse of Sentencing Discretion

"A petitioner's assertion that a sentencing judge abused his discretion in sentencing is generally not a federal claim subject to review by a habeas court."  *Echevarria-Perez*, 779 F. Supp. 2d at 337-38 (citing *Fielding v. LeFevre*, 548 F.2d 1102, 1109 (2d Cir. 1977) (holding that the petitioner did not raise a cognizable federal claim by seeking to prove that the state court abused its sentencing discretion in disregarding his psychiatric reports)).  "No federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law."  *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) (per curiam).

Petitioner was convicted of second-degree arson (P.L. § 150.15), which is considered a class B violent felony offense. N.Y. Penal Law § 70.02(1)(a). The sentence imposed for a class B violent felony offense must be a determinate sentence and must include a period of post-release supervision in accordance with P.L. § 70.45. *Id.* § 70.00(6). Subject to exceptions not relevant here, the sentence imposed upon a person convicted of a class B violent felony offense must be a determinate sentence of imprisonment and must accord with P.L. § 70.02(3). *Id.* § 70.02(2)(a). Under P.L. § 70.02(3), the determinate sentence for a class B violent felony offense must be at least five years and must not exceed 25 years. *Id.* § 70.02(3)(a). The period of post-release supervision for a determinate sentence imposed pursuant to P.L. § 70.02(e) for a class B violent felony offense must not be less than two and one-half years nor more than five years. *Id.* § 70.45(2)(f).

Thus, "[a]lthough [Petitioner]'s sentence was the maximum permitted by statute, it did not exceed what was permissible under New York's sentencing scheme." *Echevarria-Perez*, 779 F. Supp. 2d at 338. Accordingly, the claim that the trial court abused its discretion by imposing the statutory maximum sentence fails to present a federal constitutional issue cognizable on habeas review and is dismissed.

### 2.    Violation of the Eighth Amendment

The Supreme Court has articulated a principle of "gross disproportionality" for measuring whether a prisoner's sentence violates the Eighth Amendment proscription against cruel and unusual punishment. *Harmelin v. Michigan*, 501 U.S. 957, 1005 (1991) (collecting cases); *see also Lockyer v. Andrade*, 538 U.S. 63, 72 (2003) (stating that the

- 25 -

only "clearly established" legal principal in the Supreme Court's Eighth Amendment jurisprudence is that "[a] gross disproportionality principle is applicable to sentences for terms of years"). "The Eighth Amendment does not require strict proportionality between crime and sentence." *Id.* at 1001. "Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Id.* (quoting *Solem v. Helm*, 463 U.S. 263, 288 (1983)). Even "[s]evere, mandatory penalties" are tolerated under the Supreme Court's Eighth Amendment jurisprudence. *Id.* at 994. Although they "may be cruel, . . . they are not unusual in the constitutional sense, having been employed in various forms throughout [the] Nation's history." *Id.* at 994-95.

When pronouncing Petitioner's sentence, the trial court explained its rationale for imposing the statutory maximum:

> It is important to note that there were five people in the house when the fire was started. Five people could have died. I find no mitigating circumstances to give you leniency.

(S: 7). Petitioner has not established that the trial court unreasonably determined the facts in light of the evidence presented at trial, 28 U.S.C. § 2254(d)(2). Nor has he overcome the presumption of correctness afforded to the trial court's factual findings, *id.* § 2254(e)(1), concerning the circumstances surrounding the crime of conviction.

On direct appeal, Petitioner cited the following mitigating factors: he was 55 years-old at the time of sentencing; no one was injured in the fire; he had been employed as a cab driver for 30 years; he had only one prior felony conviction from 1992; and although he had some prior misdemeanor convictions, he was not a career criminal. However, in non-capital cases, the Eighth Amendment does not require consideration of mitigating

- 26 -

circumstances.  *See Harmelin*, 501 U.S. at 995.  This Court has no difficulty concluding that Petitioner's case is not the type of "exceedingly rare" and "extreme" case, *Lockyer*, 538 U.S. at 73 (quoting *Harmelin*, 501 U.S. at 1001 (Kennedy, J., concurring in part and concurring in judgment) (internal quotation marks and citation omitted in original)), in which the Supreme Court contemplated intervention by a federal habeas court in a state sentencing decision.  Because the Appellate Division did not unreasonably apply, or rule in a manner contrary to, the Supreme Court's clearly established Eighth Amendment precedent, habeas relief is unwarranted on this claim.

## V.  **CONCLUSION**

For the reasons above, the petition (Dkt. 1) is denied.  The Court declines to issue a certificate of appealability under 28 U.S.C. § 2253(c)(1) because Petitioner has failed to make "a substantial showing of the denial of a constitutional right," *id.* § 2253(c)(2).  The Clerk of Court is directed to update the caption to replace Joseph Noeth, the currently named Respondent, with Julie Wolcott.  The Clerk of Court is further directed to close this case.

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated:        March 11, 2024
              Rochester, New York